304 So.2d 257

Bertha Mae BARFIELD

v.

STATE.

6 Div. 727.

Court of Criminal Appeals of Alabama.

Nov. 26, 1974.

Rehearing Denied Jan. 17, 1975.

Robert R. Bryan, Birmingham, for appellant.

The victim, one Prince Albert McKinney, was killed on October 26, 1972, by pellets from the shell of a shotgun, which was fired while he was sitting in the driver's seat of his station wagon automobile parked at an apartment building in Birmingham. The pellets entered the right side of his head in front of his ear in the temple area. A deputy coroner testified that the wound was about one inch by one inch and that in his opinion the gun was fired at close range.. As to this, there is no conflict in the evidence and there seems to be no disagreement between the parties.

According to the testimony of Dorothy Ann McKinney, the wife of the victim, a witness for the State, she had been married to decedent twelve years; he was attending school at the Tarrant Educational Center; he left the home of decedent and the witness and their children near Pinson, Alabama, on his way to school, at about 8:00 or 8:30 the morning of his death, and she did not see him again until after his death.

Carolyn Goldsby, a witness for the State, testified that she saw McKinney about 11:45 A.M. the day of his death at her apartment at 2228 Twenty-first Avenue, North, in Birmingham, where he stayed about twenty minutes at that time and left her apartment with a friend. She stated she drove the automobile of deceased to the school he was attending and picked him up there at about twenty minutes before 3:00 P.M.; they left the school and went to her apartment; on their way to her apartment she saw defendant driving an automobile in the opposite direction; defendant blew the horn of her automobile twice. The witness and deceased arrived at her apartment about 3:00 P.M. With the exception of a few minutes spent with a girl friend and about five minutes going to a store, she spent the rest of the time with decedent at her apartment until they left the apartment about ten minutes before 8:00 that night. McKinney got in his car, a station wagon, on the driver's side; she walked around behind the station wagon and got in on the passenger's side in the

William J. Baxley, Atty. Gen., Montgomery, and Quentin Q. Brown, Jr., Asst. Atty. Gen., Birmingham, for appellee.

LEIGH M. CLARK, Supernumerary Circuit Judge.

This is an appeal from a conviction of murder in the first degree and a sentence of life imprisonment in the penitentiary.

front seat, where she sat with one foot inside the car. As she was reaching for the door, she heard a loud noise and got out of the car. She said she couldn't tell where the loud noise came from, she stood there talking to McKinney, but he didn't respond. She said something about a blowout, but McKinney said nothing; he never moved; she looked on her side of the car and kept talking to McKinney, but he never responded. She was on the passenger side. She noticed smoke in the automobile; it was "haze like." She then ran down the street and started screaming. She obtained assistance and returned to the automobile and then learned that McKinney was dead.

Sergeant James E. Gay, a homicide investigator for the Birmingham Police Department testified that he had a call to 2228 Twenty-first Avenue, North, and found the dead body of McKinney in the front seat of a station wagon, where it was parked. He made an examination, conducted an investigation and took some photographs. Thereafter, he went to the morgue to view the victim; went to the office and took a statement from Carolyn Goldsby. On October 30, at approximately 9:00 P.M., he had a conversation with defendant in front of her father's house. She stated that she had gone with Prince Albert McKinney but had not gone with him since July, but that she saw him ride by her house about 8:00 A.M. the day of his death. She said that she had a son four months old by Prince Albert McKinney. After talking with her for sometime, the witness "asked her could she come to my office to make a formal statement, where a stenographer could take it down, and she said, 'Yes.'" An appointment was made for 3:00 P.M. the following day. At about 3:50 P.M. the following day he took a statement from her, in which she substantially repeated what she had stated to him the day before and answered some other questions. During the course of this conversation he asked her if she ever fired a shotgun and she replied that she had in 1970 when she was preg-

nant, that there was a snake in her house. He asked her if she knew where Carolyn Goldsby lived and she stated she did not "unless she lived with her mother." After this rather detailed conversation, he went to the snack bar and got the defendant a Coca Cola. As he was bringing it to her and as he approached the door of the room she was in, he heard her talking, stating "he made me do it. He hypnotized me. He said, 'Vishanti.' He has done this on several occasions." She continued to talk to herself, saying that McKinney had told her to kill him, and when she finished talking the witness went into the room and assisted her back to the chair from a "fetal" position. The witness said that after he had brought her some kleenex and she had drunk part of the Coca Cola, he "advised her of her rights" and testified in detail what he advised her, as to which it seems to be without dispute that there was full compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Thereafter, defendant in detail confessed that she had killed McKinney. She said she saw him downtown that day, that she told him that she was taking the baby to the hospital because he had been bitten by a scorpion, and defendant then said "Vishanti.", which was an expression he had used on many occasions to hypnotize her; she stated he instructed her to get his rifle and come to 2228 Twenty-first "Street," North; that his station wagon would be parked at the back side of the apartments, that he would afterwards come down the steps about 8:00 with Carolyn Goldsby. He told her that defendant was to get inside the station wagon and wait in the back and that when he got to the door she was to shoot him in the stomach "because his time was out and he had not done what he was supposed to do." She said that when he sat down she pushed the safety off and pulled the trigger and the girl that was with him said "I heard something, a blowout" and took off running. Defendant said she then jumped out and ran down the alley and threw the gun away. Sergeant Gay further testified that

the defendant then took him and another officer to the place where she said she threw the gun away and found the gun, which was introduced in evidence.

Defendant testified at length. She denied killing McKinney and denied confessing that she had done so. She also testified that Sergeant Gay and another officer told her where the gun was and took her to it.

Several witnesses testified to a claimed alibi, stating that defendant was at home, in the Pinson area, some twenty miles from the scene of the killing, at the time the killing occurred.

One of the chief contentions of appellant is that defendant's constitutional right against self-incrimination was violated and that the confession by her should not have been admitted in evidence. It is contended that, although defendant was fully advised of her rights prior to the actual confession, there was a custodial interrogation beforehand, before she had been advised of her rights, and that the actual confession subsequently made was fruit of a prior poisonous tree of an unconstitutional custodial interrogation, which precluded a finding that she voluntarily, knowingly and intelligently waived her constitutional rights against self-incrimination and to counsel.

The trial court allowed the State and defendant to go thoroughly into the question of the admissibility of the confession by voir dire interrogation of witnesses, all out of the presence of the jury. After extended testimony, argument by counsel for the parties respectively and obviously careful consideration, the court ruled that the evidence of the confession was admissible.

It is clear to us that according to some of this testimony on voir dire, the interrogation prior to the confession points in the direction of an in-custody investigation. On the other hand, it is equally clear that much of the testimony tends to lead to an opposite conclusion.

If there was no in-custody interrogation of defendant prior to the confession obtained after her rights had been fully made known to her, there can be no basis for a claim that the confession was a fruit of the poisonous tree. In order for it to be such, the tree relied upon must have itself been wrongful, that is, an in-custody interrogation without a waiver by defendant of her right to have counsel and her right against self-incrimination.

■ Both of the prior interrogations were apparently free of coercion or any other impropriety on the part of the officers. Although some of the questions suggest the possibility of defendant's being a suspect, and possibly a prime suspect, we are convinced by the entire interrogations and all of the circumstances, that the investigation had not focused upon her before or during either of such interrogations. Clearly they had not arrested her, and they had given no indication whatever that they planned to arrest her. Sergeant Gay talked with seven or eight other people in and around the area where the body was found, including Carolyn Goldsby and decedent's wife. It may be that the officers should have then suspected defendant, but the record as a whole, including the testimony of Sergeant Gay in charge of the investigation, is to the effect that they did not suspect her, that their investigation had not focused on her, until she spontaneously, out of the presence of an officer, volunteered statements disclosing that she had taken McKinney's life. The "totality" of the circumstances convinces us that the prior interrogations do not qualify as an in-custody interrogation requiring the preliminary declarations and questions mandated by *Miranda,* and this is vivified, in our opinion, by the aboutface on the part of Sergeant Gay when there came to him evidence of defendant's guilt. He obviously understood the requirements of *Miranda* and that they did not apply unless and until an in-custody investigation focusing on the one being interrogated had commenced. This differ-

**20**

ence in action on the part of Sergeant Gay, along with the other evidence, furnishes strong support to the position of the State that until the dramatic incident of the spontaneous statements by defendant, she was being interviewed as a possible witness, as a lead, but not as one from whom the officers expected or hoped to obtain a confession. To have stated to her prior to that time, as was stated to her prior to her confession, that she had the right to a lawyer, that the State would provide her a lawyer if she could not afford one, that she had the constitutional right not to incriminate herself, would have been inconsonant with the action and attitude of the officers otherwise shown by the evidence.

Counsel for appellant acknowledges that "when focusing on the Defendant occurs, it is a primary element in deciding whether the question of custodial interrogation or non-custodial interrogation exists." Of weighty influence is the statement in Brown v. Beto, 468 F.2d 1284, 1286 (5th Cir.1972) as follows:

"In making the distinction between custodial and non-custodial interrogation this court has singled out certain criteria as having special significance; these include probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. Although none of these factors is alone determinative, we have recently indicated that the most compelling is whether or not the focus of the investigation has finally centered on the defendant."

The insistence that defendant's confession was the fruit of a poisonous tree fails for another reason, we think. Authorities are cited by appellant in support of the proposition that a second confession obtained after full *Miranda* warnings are given is rendered inadmissible if it is the progeny of a previously inadmissible confession or action in obtaining a previously inadmissible confession. United States v.

Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Randall v. Estelle, 492 F.2d 118 (5th Cir. 1974) Fisher v. Scafati, 439 F.2d 307 (1st Cir. 1971); Williams v. United States, 328 F.2d 669 (5th Cir. 1964). In United States v. Bayer, *supra,* it was stated:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good."

The inapplicability of the particular proposition and the authorities cited in support of it is clear in that in this case there was no prior confession. There was nothing in any statement made by defendant in either of the two prior interrogations that "let the cat out of the bag." The statements were to the contrary. Furthermore, there was no improper conduct upon the part of the officers that could have been a procuring cause of the confession. The basic propriety of their conduct as shown by the evidence is attested by the defendant herself, who testified that nobody at the City Hall mistreated her or told her that it would be better to tell what happened or made her any promise.

Another major contention of appellant is that the trial court should have ordered a hearing by a jury as to the mental competency of defendant to stand trial. The statutory law expressly relied upon by appellant is as follows:

"If any person charged with any felony be held in confinement under indictment, and the trial court shall have reasonable ground to doubt his [her] sanity, the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity . . ." Title 15, § 426, Code of Alabama.

Appellant relies heavily upon Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), in which it was held that a judge must empanel a jury and conduct a sanity hearing where there is a bona fide doubt as to the defendant's mental competency to stand trial and that absent such a determination he cannot be constitutionally tried and convicted.

The particular point was not raised at or before the trial of defendant. The first suggestion of such, or any related contention, is found in ground 24 of defendant's motion for new trial, wherein it is alleged:

"24. It has been learned since trial that there was a strong question regarding whether the Defendant was even competent to proceed to trial. Information was available prior to and during trial and evidence was revealed at trial clearly indicating there was a question regarding the mental competency of the Defendant. Thus, it is asserted the Court erred in not conducting a separate hearing before a jury to determine the limited issue of the competency of the Defendant to stand trial. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2nd 815; Pierce v. State, 6th Div. 205 (Ala.Ct. of Criminal Appeals, Sept. 28, 1973)."

For *Pate* to apply there must have been reasonable ground for a doubt or a "bona fide doubt" as to the defendant's mental competency to stand trial. We cannot say that there was a basis for such a doubt in this case, and we cannot put the trial judge in error for his failure to find a basis for such a doubt. Unlike circumstances existing in *Pate, supra,* where there was positive testimony of defendant's long history of irrational behavior, attempts at suicide, medical records of hospitals where he was confined as a mental patient undergoing varied hallucinations, there was no history or evidence in this case of any mental abnormality, unless found in defendant's own after-the-crime declarations or behavior.

Defendant was represented on trial by counsel of her own selection and employment. After her conviction, she selected and employed other counsel who filed the motion for a new trial and appeared for her on appeal. Ground 25 of the motion for new trial alleges that counsel for defendant at the trial "did not adequately and competently represent" the defendant, and the alleged "general grounds for said contention" contained the sentence "No effort was expended by said counsel to determine her mental competency to stand trial." Ground 25 of the motion for new trial is not directly insisted upon on appeal, but it should be said that defendant was represented by one of the Bar's most experienced advocates in criminal cases, and the record shows that he defended the case with commendable skill and diligence and did all within reason to obtain a verdict of not guilty. Even if the post-mortem critique should reveal some mistake on his part, which we doubt, it is clear that defendant was not deprived of the assistance, advice, and advocacy of competent counsel.

It is to be noted that at arraignment defendant pleaded not guilty and not guilty by reason of insanity. It seems, but as to this we are not certain as the transcript does not show the arguments of counsel, that the plea of not guilty by reason of insanity was not insisted upon by defendant. It may be that hindsight will now dictate that it should have been insisted upon, but we doubt it. At any rate, defendant and her attorney forthrightly took the position that she was not guilty as a matter of fact, that she was not present when McKinney was killed, and several witnesses took the stand and testified that she was approximately twenty miles away from the scene of the crime at the time of its commission. Defendant and her counsel could have rested the case without her testimony, but they could not have well allowed her to testify, as she did, to prove that she did not kill McKinney at the same time that they were taking the position that she did kill him while

under his hypnotic influence. If defendant had been acquitted, and she could have been, on the evidence presented, the method of handling by her attorney would have been acclaimed. He cannot be justly blamed for taking such action merely because he lost. Especially is this true when, as it seems to us, any other course would have led to the same verdict.

 On the hearing of the motion for a new trial, defendant's then attorney sought to offer evidence as to defendant's insanity. The trial court declined to allow him to do so. It seems that defendant's attorney was attempting chiefly to show that, "at the actual time of the shooting, she did not have the necessary intent, or premeditation, to constitute first, or second, degree murder." He referred to the evidence as to the claimed hypnotic state of defendant and as to the influence of deceased over defendant. There is little, if anything, to indicate that defendant's counsel was then seeking to show insanity at the time of the trial of the case, which is the sole basis for the opinion of the court in Pate v. Robinson, supra. Even if defendant had sought at the time to produce new evidence to show that defendant was insane at the time of trial, there is no contention or basis for belief that such evidence would have had any material bearing upon whether at the time of trial there was reasonable ground for a doubt or a "bona fide doubt" as to defendant's sanity at that time.

As an additional reason for the claim of appellant that she was insane either at the time of the alleged crime or at the trial, "the gruesomeness of the crime" is emphasized in appellant's brief. Although there seems to be one school of thought to the effect that one who commits a crime is necessarily to some extent so mentally deranged as to excuse· or mitigate the crime and that the worse the crime the greater the derangement, such sentimentalism finds no support in law or logic.

We have reviewed the entire record as required by Title 15, Section 389, Code of Alabama 1940 and conclude that there is no prejudicial error therein and that the judgment of the trial court should be affirmed.

The foregoing· opinion was prepared by Hon. Leigh M. Clark, Supernumerary Circuit Judge, serving as a judge of this Court under § 2 of Act No. 288, Act of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of the Court.

The judgment below is hereby

Affirmed.

All the Judges concur.