Bertha Mae BARFIELD,
Petitioner-Appellant,

v.

STATE of ALABAMA,
Respondent-Appellee.

No. 75–4187.

United States Court of Appeals,
Fifth Circuit.

May 26, 1977.

Robert R. Bryan, Birmingham, Ala., for petitioner-appellant.

William J. Baxley, Atty. Gen., Montgomery, Ala., Quentin Q. Brown, Jr., Barry V. Hutner, Asst. Attys. Gen., Birmingham, Ala., for respondent-appellee.

Before RIVES *, GEWIN and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

Bertha Mae Barfield appeals from an order denying her petition for habeas corpus. In 1972 she was convicted of the first degree murder of Prince Albert McKinney and sentenced to life imprisonment. Her conviction was affirmed by the Alabama Court of Criminal Appeals, *Barfield v. State*, 54 Ala.App. 15, 304 So.2d 257 (1974), after which she sought relief in the district court. The primary question to be decided by this court is whether her interrogation by a Birmingham, Alabama police officer constituted "custodial interrogation" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We conclude that she was not the subject of such an interrogation and, therefore, the order of the district court denying her petition for habeas corpus is affirmed.

Basic to our decision is *Miranda v. Arizona, supra*, in which Chief Justice Warren defined the threshold requirement of custodial interrogation as "questioning initiated by law enforcement officers after a person

has been *taken into custody or otherwise deprived of his freedom of action in any significant way.*" 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (emphasis added) (footnote omitted). Courts and commentators have probed every nuance of the above-emphasized definition in attempts to apply this language to various fact situations. The cases in which application of the definition are most troubling can generally be divided into two groups; those situations in which *Miranda* applies outside the confines of the station house, and those situations in which a person is deemed to have not "been taken into custody or otherwise deprived of his freedom in any significant way" while being questioned by law enforcement personnel at their offices.[1] It is within this latter group that the present case falls.

Prince Albert McKinney was killed on October 26, 1972 while he was sitting in his car, which was parked at the apartment of his girl friend, Carolyn Goldsby. Barfield had previously been intimately involved with the decedent, who was the father of her son born earlier that year. Their relationship ended about the time of the child's birth and McKinney's subsequent relationship with Goldsby apparently resulted in jealousy on the part of Barfield.

Sergeant James E. Gay of the Birmingham Police Department testified at Barfield's trial that he was called to the scene of the McKinney shooting, where he conducted an investigation. Later that same evening he took a statement from Goldsby in which Barfield was mentioned as a possible suspect. Several other persons were also interviewed. Gay's first contact with Barfield occurred four days later on October 30, 1972, when he talked with her at approximately 9:00 p. m. in front of her father's house. During this conversation, Gay asked about her relationship with

---

* Judge Rives was a member of the panel that heard oral argument but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46.

1. *Compare e. g., Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (*Miranda* applicable to early-morning boarding house bedroom questioning) *with Oregon v. Mathiason*, —— U.S. ——, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*Miranda* not applicable when defendant voluntarily went to station house) *and Freije v. United States*, 408 F.2d 100 (1st Cir. 1969) (voluntary interview).

McKinney, whether she possessed a shotgun, and about her activities on the day of the murder. He then asked whether she would come to his office for a second meeting the next afternoon at 3:00 p. m. and Barfield indicated that she would.[2]

She arrived at the police station on October 31, 1972 at the appointed hour but her interview with Sergeant Gay didn't begin until approximately 3:50 p. m. The questioning followed generally the same lines as it had the previous night concerning her relationship with McKinney, her activities on October 26, 1972—the day of the murder, whether she had ever fired a shotgun, if she had ever called Carolyn Goldsby,[3] and about Goldsby's relationship with McKinney. The sequence of events following this first interview on October 31 is related in the following excerpt from Sergeant Gay's testimony at Barfield's trial:

Q [by Mr. Waites, the prosecutor] All right. After this statement that you just related to us, that she made and you talked to her and had a conversation there at the office, did you stay there at the office, or did you leave the office and go somewhere?

A [by Sergeant Gay] I went to the basement, to the snack bar, and got Bertha Mae a coca cola.

Q When you left, was she still in the room, or did she go out, or what?

A She was still in the office, by herself.

Q Did you have occasion to go back up?

A Yes, sir. I carried the coke back up to her.

Q When you got there in to that—to that room, was she still in the room?

A Yes, sir. I heard her talking, and when I got to the door I stopped and looked, and she was in front of the chair that she had been sitting in, in a fetal type position.

Q Was she on the floor, or in the chair?

A On the floor.

Q What did she say?

A She was saying he made me do it. He hypnotized me. He said, "Vishanti. He has done this on several occasions.

"He told me to go to the North Gate Trailer Park and get the rifle, or gun, that he used to hunt with.

"And to come to 21st Avenue and find his station wagon, that he would be coming out of the apartment, down the stairs in the rear, at or around 8:00 o'clock, when he had to carry Carolyn to play bingo, and to shoot him in the stomach, that his time was up, that he had done wrong."

Q Now, all this time you were standing there at the door and she was on the floor, saying this?

A Yes, sir.

Q Was anybody else in that room while she was talking like that?

A No, sir.

Q Did you respond—did you say anything to her while she was saying this, or did you just stand there?

A Not until she finished talking.

Q When she finished talking, what happened?

A I went to her side, and I put the coke down on the desk and assisted her back to the chair.

I went across the room and got her some kleenex and let her use that to wipe some tears off of her face, and she drank part of the coke.[4]

Upon regaining her composure, Barfield was informed of her rights in accordance with *Miranda*. She then indicated that she would answer further questions and subsequently led officers to the murder weapon. Following the trip to the vicinity of the McKinney murder, where the shotgun was

---

2. Record on Appeal to Alabama Court of Criminal Appeals, pp. 115–16, 137, 234 (hereinafter cited as the Record).

3. Carolyn Goldsby testified that she had received a telephone call on the day of the murder and Barfield later told Sergeant Gay that she had made a threatening call to Goldbsy. Record pp. 67, 165.

4. Record pp. 143–44.

found, Barfield gave another statement that was transcribed. This statement was not signed, however, and it was not introduced in evidence.

At trial, an extensive voir dire examination of Sergeant Gay and Barfield was conducted on the question of the admissibility of Barfield's confession. The trial judge, after hearing the witnesses and the arguments of counsel, ruled that the inculpatory statement overheard by Sergeant Gay "was normally and voluntarily made."[5] This ruling was affirmed by the Alabama Court of Criminal Appeals in a thorough and exhaustive opinion. *Barfield v. State, supra.*

The decision in this case was delayed pending the Supreme Court's opinion in *Brewer v. Williams,* —— U.S. ——, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). In the interim,

however, the Court rendered a *per curiam* opinion in *Oregon v. Mathiason,* —— U.S. ——, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The facts presented in *Mathiason* are strikingly similar to the facts in the instant case and the differences that do exist are insufficient to change our conclusion that *Mathiason* controls our decision here. In *Mathiason* the Supreme Court reversed the decision of the Supreme Court of Oregon holding that a confession was the result of coercive interrogation and not admissible into evidence.[6]

In reaching its conclusion in *Mathiason* the Supreme Court quoted the description of the factual situation and the reasoning given by the Supreme Court of Oregon. That portion of the decision is printed in the margin.[7] As was Mathiason, Barfield

---

**5.** Record p. 126.

**6.** We find it unnecessary to engage in a detailed discussion of the *Brewer* decision because the facts of that case are markedly different from those in this case.

**7.** The Supreme Court of Oregon described the factual situation surrounding the confession as follows:

"An officer of the State Police investigated a theft at a residence near Pendleton. He asked the lady of the house which had been burglarized if she suspected anyone. She replied that the defendant was the only one she could think of. The defendant was a parolee and a 'close associate' of her son. The officer tried to contact defendant on three or four occasions with no success. Finally, about 25 days after the burglary, the officer left his card at defendant's apartment with a note asking him to call because 'I'd like to discuss something with you.' The next afternoon the defendant did call. The officer asked where it would be convenient to meet. The defendant had no preference, so the officer asked if the defendant could meet him at the state patrol office in about an hour and a half, about 5:00 p. m. The patrol office was about two blocks from defendant's apartment. The building housed several state agencies.

"The officer met defendant in the hallway, shook hands and took him into an office. The defendant was told he was not under arrest. The door was closed. The two sat across a desk. The police radio in another room could be heard. The officer told defendant he wanted to talk to him about a burglary and that his truthfulness would possibly be considered by the district attorney or

judge. The officer further advised that the police believed defendant was involved in the burglary and [falsely stated that] defendant's fingerprints were found at the scene. The defendant sat for a few minutes and then said he had taken the property. This occurred within five minutes after defendant had come to the office. The officer then advised defendant of his *Miranda* rights and took a taped confession.

"At the end of the taped conversation the officer told defendant he was not arresting him at this time; he was released to go about his job and return to his family. The officer said he was referring the case to the district attorney for him to determine whether criminal charges would be brought. It was 5:30 p. m. when the defendant left the office.

"The officer gave all the testimony relevant to this issue. The defendant did not take the stand either at the hearing on the motion to suppress or at the trial." *State v. Mathiason,* 549 P.2d 673, 674 (1976).

The Supreme Court of Oregon reasoned from these facts that:

"We hold the interrogation took place in a 'coercive environment.' The parties were in the offices of the State Police; they were alone behind closed doors; the officer informed the defendant he was a suspect in a theft and the authorities had evidence incriminating him in the crime; and the defendant was a parolee under supervision. We are of the opinion that this evidence is not overcome by the evidence that the defendant came to the office in response to a request and was told he was not under arrest." Id. at 675.

was pointed out to police as a possible suspect and both went to the police station voluntarily. Admittedly, Barfield was not informed that she was not under arrest, but neither was she informed that she was. It is clear from the record that she was not physically restrained in any manner and was in fact left alone on at least one occasion. The cases cannot be distinguished on the fact that Mathiason was allowed to leave the police station at the conclusion of his interview, while Barfield was placed in jail. Sergeant Gay would indeed have been derelict in his duty had he allowed her to go free. A further dissimilarity between the two cases is the fact that Mathiason was falsely told that his fingerprints had been found at the scene of the crime. No hint of such conduct on the part of the Birmingham police is alleged here.[8]

The following discussion of the custodial interrogation issue in *Mathiason* is pertinent:

Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

—— U.S. at ——, 97 S.Ct. at 714, 50 L.Ed.2d at 719 (emphasis in original). In light of the foregoing, we are not persuaded that Barfield was "in custody" at the time Sergeant Gay overheard her inculpatory statements.

■■■ Barfield's counsel contends that she was restrained because she was told by Sergeant Gay that she could not leave. The force and effect of such a statement, assuming it was made,[9] is diminished by the fact that Barfield was left alone, her departure unimpeded by physical restraints or the presence of other officers. When viewed in that light, Gay's alleged statement to Barfield that she remain in the office seems more in the nature of a precatory request than a command. See *United States v. Brunson*, 549 F.2d 348, 357 nn. 12 & 13 (5th Cir. 1977).

■■■ Relying on *Brown v. Beto*, 468 F.2d 1284 (5th Cir. 1972), and other authority from this circuit, Barfield claims that her first confession[10] was illegal and, therefore,

---

8. The Court noted that this false statement by the police to Mathiason was of no consequence in determining whether there was in fact a custodial interrogation. *Oregon v. Mathiason,* —— U.S. ——, ——, 97 S.Ct. 711, 713, 50 L.Ed.2d 714, 719 (1977).

9. The State contends that prior to her arrest Barfield was never "denied the right to leave the police station." Brief for appellee, p. 3.

10. In her brief Barfield emphasizes the length of her interrogation and describes her statements admitting possession of the shotgun in question and the knowledge of how to fire it as "the first confession." This took place prior to the time when the officer left her alone to obtain a drink for her and upon his return

found her on the floor. The *Miranda* warnings given are described in the brief as perfunctory. Brief p. 18.

She argues that any subsequent statement should be suppressed as fruit of this illegally obtained "first confession." A reading of the transcript of the first interview with Sergeant Gay shows that Barfield did not confess at the time indicated. Certainly she did admit possession of a shotgun and knowing how to fire it, but that cannot be considered a confession where there was no established nexus between the shotgun possessed by her and the murder weapon. While a statement that a person possesses a weapon similar to that used in a murder is more inculpatory than a denial of possession, such a broad statement alone cannot be

inadmissible because the investigation had focused on her. Such reliance is misplaced where the facts of the interrogation here are as close as they are to the facts in *Mathiason*. "Such a noncustodial situation is not converted to one in which *Miranda* applies simply . . . because the questioned person is one whom the police suspect. *Oregon v. Mathiason*, —— U.S. ——, ——, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977).

AFFIRMED.

considered a confession, where the weapon is commonly found within the community. Indeed she made the same statements on a prior occasion when she talked to the policeman in front of her father's house.