**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Santos CHARLES, Jr. and Steven McAninch, Defendants-Appellees.**

No. 83–2550.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1984.

William Bradford Reynolds, Asst. Atty. Gen., James William Clute, Walter W. Barnett, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellant.

Phil Westergren, Corpus Christi, Tex., for Charles.

Roland E. Dahlin, III, Federal Public Defender, George McCall Secrest, Jr., Thomas S. Berg, Asst. Federal Public Defenders, Houston, Tex., Gustavo L. Acevedo, Asst. Federal Public Defender, Laredo, Tex., for McAninch.

Before POLITZ, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this case the United States appeals an order of the district court granting the motion of defendants-appellees to suppress certain post-offense, preindictment oral and written statements. The district court found that the defendants made the statements while they were in custody and that the government failed to meet its burden of proving that the statements were made pursuant to a voluntary waiver of defendants' rights after the defendants received proper warnings in accordance with *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because we conclude that both findings were clearly erroneous, we reverse the order of the district court.

Defendants Charles and McAninch, who were police officers with the Alice, Texas police department, were indicted by a federal grand jury on September 23, 1982 for violating the civil rights of a citizen while acting under color of state law. These

charges stemmed from the death of Juan Alonzo, an individual arrested by Charles and McAninch and allegedly assaulted by them on January 12, 1981.

In pretrial proceedings before the district court below, both defendants moved in October and December 1982 to suppress the written statements they had given to Luis Salinas, an investigator employed by the district attorney's office of Jim Wells County, of which Alice is the county seat, on March 3, 1981, during the course of the state's investigation of the death of Juan Alonzo. The defendants also sought to suppress oral statements made by them to Bruce Stepp, an F.B.I. agent, on March 16, 1981, in which they each essentially verified the truthfulness and accuracy of the March 3 statements. After a hearing on the motions, the district court granted the motions to suppress the March 3 and March 16 statements, and the government appealed. While that appeal was pending, the government discovered an error in the grand jury proceedings that required dismissal of the original indictments. The district court granted the government's motion to dismiss the indictments without prejudice, and this Court subsequently granted the government's motion to dismiss the appeal.

On July 6, 1983 Charles and McAninch were reindicted on the same charges. The district court granted the parties' joint motion to make most of the proceedings in the earlier case, including the motions to suppress, part of the record in the pending case. All parties agreed that no additional evidence was needed to determine the issues. The district court then adopted its previous order granting the defendants' motions to suppress the statements.

## I.

### THE SUPPRESSION HEARING

At the hearing on the motions to suppress, only the government presented any evidence. The defendants maintained that the March 3 statements had been taken by Salinas, who died in April 1982,[1] and that the government could not substantiate that the statements were the defendants' statements or that proper warnings were given and that improper inducements were not. The defendants chose to offer no evidence on their contentions.[2]

---

**1.** Salinas was found with a gunshot wound to his head in his bedroom at his parents' home. A pistol was found in his hand. The cause of his death was ruled to be "undetermined." There had been "a family problem between his father and his grandfather." These matters are reflected by the district attorney's testimony.

**2.** The motions to suppress themselves stated not even conclusory grounds. One defendant's supporting brief (which also related to other matters sought to be suppressed, including a pre-March 3, 1981 statement by one or both of the defendants) stated only that the statement was taken "when the focus of the investigation was upon the defendant" and "was taken by a police officer who is now deceased. Thus it cannot be directly admissible against Defendant as there is no way to authenticate it or establish the truth of the allegations contained therein without calling Defendant as a witness." Except for apparently having adopted that brief, the other defendant made no written statement of grounds for the suppression of the statements here at issue.

At the suppression hearing defense counsel stated that it was their position that the March 3, 1981 statements were "the product of custodial interrogation," but made no specific or particular allegations (such as that defendants were under arrest or any other restraint) in support of this conclusion. Defense counsel on that occasion further stated the following objections to the March 3, 1981 statements:

"It's our position that the government must establish, first of all, that all the predicates on the statements were complied with .... And that they cannot do so without the investigator Salinas. The investigation indicates that Salinas was with the defendant alone when those statements were allegedly executed. We do not even admit that they were executed .... Those are the statements that we contend the government has not and cannot lay a proper predicate for under Miranda and under the Sixth Amendment, generally.... [W]e are not admitting warnings. We are not admitting lack of suggestability. We are not admitting absence of inducement, persuasion, et cetera."

And

"... on the grounds that 'A' they were taken by a person who is now deceased, and there is no way the government can substantiate 'A' that they were the statements of the defendants, the respective defendants in the case; or 'B' that the proper warnings were given, improper inducements were not."

The government's central witness at the suppression hearing was Bruce Stepp, the F.B.I. agent who interviewed Charles and McAninch on March 16, 1981 as a part of a federal civil rights investigation of the circumstances surrounding the alleged assault and death of Juan Alonzo. Stepp testified that both of the defendants were then suspected of having committed a civil rights violation in that connection. He indicated that McAninch's name had been given to him as one of the officers who was probably involved in the beating of Juan Alonzo. Prior to his interviews with the defendants, Agent Stepp contacted the Alice, Texas chief of police and asked the chief to have Charles and McAninch come in for interviews on March 16, 1981. It was stipulated that the chief then "notified" the defendants to be at his office on the 16th.

Stepp's interviews with the defendants on March 16, 1981 were conducted at the Alice, Texas police department in the office of the chief of police. Immediately prior to his interviews with the defendants, Stepp obtained copies of the written statements the defendants had given on March 3, 1981 to Salinas, the investigator with the Jim Wells County district attorney's office. At the commencement of the interviews he advised both defendants that they were being interviewed in regard to an alleged civil rights violation involving the arrest of Juan Alonzo and that any information they furnished could be used in a court of law, but did not read them their *Miranda* rights. He testified at the suppression hearing that the defendants were not in custody at the time of the interviews.

Stepp further testified that neither of the defendants was physically detained and that they were both free to come and go. Furthermore, both of the defendants were working as police officers when they were interviewed by Stepp. In the course of the interviews, Stepp showed each of the defendants his March 3 statement, read the statement aloud, and allowed each defendant to read the statement himself. Defendant Charles stated that his March 3 statement was true and correct and that he had no additions or changes to make. Defendant McAninch said that the statement was basically correct but he specified four minor additions or clarifications he wished to make.

The March 3 statements taken from the defendants by Salinas and adopted by the defendants in their March 16 interviews with Stepp essentially set forth a written account of the arrest and booking of Juan Alonzo. Both of the statements admit that the defendants struck Alonzo while he was being booked. The statements also indicate that the defendants were employed as patrolmen at the time they gave the statements. The statements appear on forms captioned "Voluntary Statement" with printed language to the effect that the

When the court inquired of counsel how they intended to proceed, the government responded that it would be brief, and then the following exchange took place between defense counsel and the court:

"[Defense Counsel]: From an evidentiary standpoint, the defendant is not going to have a part. Our contention is that the predicate cannot be established.

"The Court: Simply because it was given by Mr. Salinas, who is now deceased and, therefore, there is—

"[Defense Counsel]: Yes, sir."

Defense counsel's closing argument at the suppression hearing was as follows:

"[Defense Counsel]: We, of course, we do rest on this matter, Your Honor. We feel that it has been established 'A' that the interrogation by Agent Stepp [on March 16] was custodial; that the focus of the investigation had clearly been placed on the officers; that they were—now, the times are notified, but when you are notified by your chief of police to get yourself into the station because the FBI wants to talk to you, you are under restraint. Now, going back to the original [March 3, 1981] document. We didn't know, we don't know whether that, whether the voluntariness test of both Miranda and Jackson v. Denno were complied with. Agent Stepp stated that he couldn't say that he knows whether it's a—I don't know whether it's voluntary or not. That was his testimony. Well, that's—they just don't have enough. It's not predicated—I don't believe it's even predicated that it is, in fact, their statement, but it's certainly not predicated that it meets the voluntariness standard."

The foregoing reflects all the defendants' material allegations and contentions in the district court respecting the suppression of the March 3 and March 16 statements.

person taking the statement has warned the subject of his *Miranda* rights, followed by a printed statement of those rights. The statements also contain a printed paragraph indicating that the person giving the statement "hereby knowingly, intelligently, and voluntarily waive[s] the above explained rights."[3] The defendants and Investigator Salinas signed each page of the defendants' respective statements.

The government's only other witness at the suppression hearing was Rolando Ramirez, the district attorney for Jim Wells County. He testified that the defendants had appeared before a Jim Wells County grand jury in connection with the state's investigation of Alonzo's death and that their testimony before the grand jury outlined substantially the same facts as those contained in their March 3 statements. Ramirez also testified that he had requested Salinas to take the statements from the defendants, that Salinas thereafter reported having done so, and gave Ramirez the written statements, and that he could authenticate Salinas' signature on the statements.

## II.

### CUSTODY

At the suppression hearing, both the defendants and the district court oper-

---

3. The first page of each statement commences with identifying information such as the date and place where the statement was taken (March 3, 1981, district attorney's office), the name of the person giving the statement and his age (Charles, thirty-nine and McAninch, twenty-four), addresses (Alice, in each case), and then continues as follows (all printed except "Luis R. Salinas" and "Chief Investigator," which are typed):

"I am giving this statement to Luis R. Salinas, who has identified himself as a Chief Investigator, and he has duly warned me that I have the following rights: that I have the right to remain silent and not make any statement at all; that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the interview at any time.

"Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and without compulsion or persuasion by any person or persons whomsoever: ...."

There follows, for all the balance of the first page of each statement, the substantive recitation made by the party giving the statement; this is in typewritten form (except for a very few, brief handwritten ink interlineations or corrections) and continues on to a second, and in the case of McAninch, a third, page. In each case the substantive recitation begins by stating, "I am employed as Patrolman for the Alice Police Department."

Near the bottom of the first page, just following the typewritten segment which appears on that page, there is the printed legend: "I have read this statement consisting of ＿＿ page(s), each page of which bears my signature, and I do affirm that all facts and statements contained herein are true and correct." (The blank is filled in with a typed "two" in McAninch's statement, but is not filled in in Charles'.) Then there follows what appears to be Charles' and McAninch's ink signature on each of their statements respectively, below which is the printed legend: "Signature of person making voluntary statement." Below this is the printed statement: "The above warnings were given by and this voluntary statement was taken by," followed by the purported ink signature of Salinas, just underneath which are the printed words "(This must be one and the same person as named above)."

Charles' statement continues for one more page, McAninch's for two. The subsequent pages are all in typewriting (except for ink signatures and the few, brief ink handwritten interlineations or corrections); each has a heading "Voluntary Statement of Officer" followed by Charles' and McAninch's names on their respective statements; then, "Date: March 3, 1981"; "Place: District Attorney's Office"; and, the number of the page and the total number of pages in the statements. Each of these pages has at its bottom the purported ink signature of Salinas and of the person making the statement. Just below the signatures are the typed names of the respective persons signing. Next to Salinas' thus typed name, and beneath the typed line for his signature, are the following typed legends: "Officer giving warning and taking statement" (page three of McAninch's statement); "Officer giving warning" (page two, McAninch); "Chief Investigator signature of person giving warnings and person taking voluntary statement" (page two, Charles).

All the printing and typing is clear and easily read. There is no "fine print."

ated under the assumption that the burden of proving the admissibility of the March 3 statements was wholly upon the government. This, however, is not entirely correct. It is established that both the burden of production and the burden of persuasion generally rest upon the movant in a suppression hearing. *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977). *See also United States v. Glasgow*, 658 F.2d 1036, 1044 (5th Cir.1981); *United States v. Haydel*, 649 F.2d 1152, 1157 (5th Cir.), *modified on other grounds*, 664 F.2d 84 (5th Cir.1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982). In the present instance, the defendants' burden required that at a minimum they demonstrate that the March 3 statements were obtained while they were under custodial interrogation. As we stated in *De La Fuente:*

> "It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. [Citations omitted.] Concededly, in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant. For example, ... if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimina-tion. . . . And even in those situations ["in which the government may bear the ultimate burden of persuasion"], the defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality." 548 F.2d at 533–34.

*See also United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir.1975).

Having considered the suppression hearing record, we conclude that the defendants failed to meet their burden of proving that they were in custody at the time the March 3 statements were taken and that the evidence is insufficient to support the district court's finding that they were then in custody. The district court emphasized the presence of a confession work sheet attached to the March 3 statement of defendant Charles (there is no such work sheet with reference to McAninch's statement). The work sheet reflects that *Miranda* warnings were given and understood. It also includes "no" answers to the following questions: (1) was there any indication the suspect did not understand English; (2) did the suspect request any food or drink; (3) did the suspect ask to make any telephone calls; (4) did anyone attempt to contact the suspect during the interview; (5) did the suspect appear intoxicated; (6) did the suspect appear mentally ill or retarded; and (7) did the suspect complain of any physical injuries.[4] From the fact that

---

**4.** The work sheet is a one-page printed form titled "Confession Worksheet." In the middle of the page the above-referenced questions, followed by "yes" and "no" blanks, are printed, with the "no" blank checked in ink handwriting. There follow unfilled blanks for "other officers present while taking statement" and length of time of taking statement; the name of "secretary who typed statement" is filled in in ink handwriting.

At the top of the form the "name of accused" blank is filled in in ink handwriting "Santos Charles"; the following blank for "offense charged" is not filled. There then appears, printed, "Read these warnings:" followed by this printed wording:

"1) You are suspected of [left blank].
"2) You have the right to remain silent and you do not have to talk to any peace officer.
"3) You do not have to make a statement and if you do, the statement may be used against you in court at your trial.
"4) You have the right to have a lawyer present to advise and talk to you before and during any questioning.
"5) If you are too poor to hire a lawyer you have the right to have a lawyer appointed for you by the court so that he can advise and talk to you before and during any questioning by peace officers.
"6) You have the right to stop talking to peace officers at any time.
"Do you understand these rights I have read to you? ___yes ___no
"Do you want to give up these rights and make a statement? ___yes ___no"
Each of the "yes" blanks just above is checked in ink handwriting. There follow blanks for "Date & Time of warnings," "Place warnings

these questions were answered, the district court determined that when the work sheet was completed defendant Charles was seen and was described as a suspect. The court also noted that the investigator considered Charles as an accused to such an extent that a confession work sheet was filled out so that the confession would pass *Miranda* muster if it were challenged. The court noted that the investigator "had to feel that the circumstances were such that *Miranda* warnings were required." The district court also focused on the fact that the statements were made in the district attorney's office, and that at that time the defendants had a few days previously failed to pass a polygraph test in reference to the Alonzo incident.

█ The Supreme Court has observed that the requirement of giving *Miranda* warnings is not to be imposed simply because police question a suspect in the police station with the purpose of obtaining incriminating responses. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam). *See also California v. Beheler,* —— U.S. ——, 103

S.Ct. 3517, 3518, 3520, 77 L.Ed.2d 1275 (1983) (per curiam); *Barfield v. Alabama,* 552 F.2d 1114, 1118 (5th Cir.1977) (suspect questioned at police station, not told she was not under arrest, at least requested to remain in interrogation room while officer left for a few minutes, and arrested at conclusion of questioning). The evidence focused on by the district court in the present case shows no more than that the defendants were in the district attorney's office [5] and were viewed as suspects when they made their statements to Investigator Salinas. In both *Mathiason* and *Beheler,* the Supreme Court determined that these facts alone were insufficient to establish that a defendant was in custody at the time of giving a statement. *See also Barfield.*

█ "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler,* 103 S.Ct. at 3520 (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714).[6] *See also New York v. Quarles,* —— U.S. ——, ——, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984).[7] Defendants adduced no evidence

---

given," and "Name of Officer giving warnings," filled in in ink handwriting, respectively, "3/3/81 9:30 AM," "D.A.'s office," and "Luis R. Salinas." In this connection we observe that the time blank on Charles' statement ("Time __M.") has typed in "11:50 P" (the time blank on McAninch's statement is not filled in); neither the district court nor any of the parties has mentioned or sought to attach any significance to this.

Following the above, the form also has a blank for "Magistrate's warnings" which is checked "no," and unfilled blanks for "Name of Magistrate," "Date & Time of Magistrate's warnings," and "Officer present at Magistrate's warnings."

5. Certainly, the district attorney's office cannot be assumed to be a more "custodial" setting than the police station in *Mathiason, Beheler,* and *Barfield.*

6. We do not agree with the district court's view that the giving of *Miranda* warnings is evidence that the person questioned is under formal arrest or restraint of freedom of movement of the degree associated with formal arrest. Rather, we agree with the Court in *United States v. Lewis,* 556 F.2d 446, 449 (6th Cir.) (per curiam), *cert. denied,* 434 U.S. 863, 98 S.Ct. 193, 54 L.Ed.2d 137 (1977), that the precaution of giving

a suspect *Miranda* warnings in a noncustodial setting does not either transform that setting into, or "help [ ] produce," a custodial interrogation for *Miranda* purposes.

7. Our decisions have frequently stated that the determination of whether a custodial interrogation has occurred is guided by a consideration of the following factors: (1) whether there existed probable cause for the defendant's arrest; (2) the subjective intent of the officers as to whether they considered the defendant free to leave the site of the investigation; (3) the defendant's subjective belief regarding his freedom to leave; and (4) whether the defendant had become the focus of the investigation. *See, e.g., United States v. Lueck,* 678 F.2d 895, 900 (5th Cir.1982); *United States v. Jonas,* 639 F.2d 200, 203–04 (5th Cir.1981). We have emphasized, however, that no single element is dispositive in this determination, nor must all of the factors be present to find a custodial interrogation. *Lueck,* 678 F.2d at 900. Furthermore, we must engage in a case-by-case analysis with respect to an evaluation of these factors. *Id.* Since the only evidence in this case indicates that the defendants' March 3 statements were made at the district attorney's office at a time when they were suspected of the offense concerning which they

whatever that would tend to address this ultimate inquiry. Such evidence was not only readily available to the defendants, but was obviously less available to the government, due to Salinas' death. Indeed, the only evidence other than that focused on by the district court seems to indicate that there was no restraint on the defendants' freedom of movement "of the degree associated with a formal arrest." That evidence consisted of testimony that both of the defendants were working as police officers at the time of the March 16 interviews with F.B.I. Agent Stepp. Furthermore, the March 3 statements themselves indicate that the defendants were police officers when the statements were taken. Given the lack of any controverting evidence, we think the district court should have inferred from their status as police officers, both before and after the March 3 statements were taken, that the defendants were not "in custody." [8]

were questioned, and such factors were ruled insufficient to demonstrate custody in *Mathiason* and *Beheler*, we see no need to apply the four-factor test outlined above. The same approach was taken in *Barfield v. Alabama*, 552 F.2d 1114 (5th Cir.1977), a case in which we found the facts indistinguishable from those in *Mathiason*, and therefore controlled by the Supreme Court's decision. We view the evidence presented here to be materially indistinguishable from the operative facts in *Mathiason, Beheler,* and *Barfield*.

8. We observe that under Texas law a district attorney's investigator (which Salinas was) is a peace officer. Tex.Crim.Proc.Code Ann. art. 2.12(5) (Vernon 1977). However, even peace officers are not authorized under Texas law to arrest without a warrant except in four sets of circumstances:

(1) the offense is "committed in his [the arresting officer's] presence or within his view," *id.* article 14.01;

(2) the offense "has been committed in the presence or within the view of a magistrate, and such magistrate verbally orders the arrest of the offender," *id.* article 14.02;

(3) "persons found in suspicious circumstances" under certain conditions, *id.* article 14.03 (article 14.03 was amended effective August 1981 to also include arrests of those there was probable cause to believe had committed "an assault resulting in bodily injury ... and the peace officer has probable cause to believe that there is immediate danger of further bodily injury to that person");

## III.

## VOLUNTARINESS OF THE CONFESSIONS

Even if we were to determine that the defendants were in custody at the time the March 3 statements were taken, the government argues that the statements should, nevertheless, not have been suppressed. It relies upon a trio of cases beginning with *United States v. De La Fuente, supra,* to argue that while the government has the ultimate burden of proving that a statement is voluntary, the defense must initially discharge its burden by producing some evidence or specific allegations sufficient to make a *prima facie* showing of illegality. *See De La Fuente,* 548 F.2d at 533; *United States v. Evans,* 572 F.2d 455, 486 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978); *United States v. Diezel,* 608 F.2d 204, 207 (5th Cir.1979).[9]

(4) where the peace officer has satisfactory information "that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant," *id.* article 14.04.

*See also* 22 Tex.Jur.3d *Criminal Law* §§ 2004-12.

When an arrest is made, with or without a warrant, the person arrested is to be taken "without unnecessary delay" before a magistrate. Tex.Crim.Proc.Code Ann. arts. 14.06, 15.17 (Vernon 1977).

Here it appears obvious that none of the circumstances authorizing arrest without a warrant were present on either March 3 or March 16, 1981, and there is nothing in the record to suggest otherwise. Moreover, nothing in the record suggests that a warrant had issued for the arrest of either defendant or that either was taken before a magistrate (or indicted) at any time during or prior to March 1981. Under this record we also believe that a presumption of regularity suggests that neither defendant was under arrest or equivalent detention on either March 3 or March 16, 1981.

9. The relevant substance of *De La Fuente* is set forth in part II of the text, *supra.*

We reiterated the burden placed upon the movant in a suppression hearing in *United States v. Evans.* There, in evaluating a suppression motion based upon an allegedly illegal seizure of certain records, we noted again that "[t]he burden is on the movant to make specific factual allegations of illegality, to produce evi-

Since the decision of these three cases, however, the Supreme Court decided *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (per curiam). The issue in *Tague* concerned the testimony of an arresting officer, at a suppression hearing, that the officer had read a defendant his *Miranda* rights from a card. The officer, however, could not remember what those rights were nor could he recall whether he had asked the defendant whether he understood the rights read to him. Furthermore, the officer could not say "yes" or "no" as to whether he made any attempt to determine if the defendant was literate or otherwise capable of understanding his rights. *Id.,* 444 U.S. at 469, 100 S.Ct. at 652. The card was not produced and there was no evidence of its contents. The evidence affirmatively showed that the defendant was under arrest at the time. Under these circumstances the Supreme Court found that "no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory state-ment." *Id.* at 471, 100 S.Ct. at 653. The Court concluded that the statement was therefore inadmissable. *Id.*

■ We are uncertain to what extent the *De La Fuente* line of cases, so far as it imposes any initial burden of production or persuasion on the defendant once his interrogation is shown to have been custodial, remains viable after *Tague.*[10] The Supreme Court in *Tague* quoted language from *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. at 1628 (1966), in which it had observed that the burden of proving a voluntary waiver rests on the government since it "is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation." It is perhaps possible to see *Tague,* in light of this quotation from *Miranda,* as disallowing, in situations where the interrogation is shown to have been custodial, the preliminary burden imposed upon defendants by *De La Fuente* and its progeny.[11]

dence, and to persuade the court that the evidence should be suppressed." 572 F.2d at 486. Finding that the motion to suppress had "alleged nothing more than that a warrantless [though actually court-authorized] search had occurred ... pursuant to a state civil action; that the search was illegal; and that evidence produced as a result of the search should be suppressed," we concluded that the defendant had not met his burden. *Id.* (footnote omitted).

Finally, in *United States v. Diezel,* a case involving a suppression motion based on the issue of whether a statement was voluntary, we noted that "while the pre-trial burden of proof concerning the voluntariness of a confession rests with the government," nevertheless (quoting from *Evans* at 486) " '[t]he burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed.' " 608 F.2d at 207. There the defendant had moved to suppress a statement he had made, but the motion was denied when the defendant's lawyer refused to proceed after arguing that the burden of proof lay on the prosecution. This Court upheld the denial of the motion on the basis of the defendant's failure to meet his burden.

**10.** *United States v. Evans,* 572 F.2d 455 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978), was cited by the First Cir-

cuit in *United States v. Winter,* 663 F.2d 1120, 1152 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983), to support its finding that a defendant had failed to meet his burdens of production and persuasion as the moving party on the issue of whether an Assistant United States Attorney had misled the defendant into waiving his rights and testifying before a grand jury by promising the defendant a limited immunity. More recently, in *United States v. Madison,* 689 F.2d 1300, 1308 (7th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983), the Seventh Circuit cited *United States v. Evans* for the proposition that the movant at a suppression hearing has the burden of making specific factual allegations of illegality, of producing evidence, and of persuading the court that the evidence should be suppressed. Neither *Winter* nor *Madison* cites *Tague v. Louisiana,* however.

**11.** Since *Tague* presented a situation where the evidence affirmatively showed, without dispute, that the interrogation was custodial, it does not, in our opinion, call into question *De La Fuente*'s rule that the defendant has the initial burden of presenting evidence sufficient to support a finding that the interrogation was custodial. If this burden is not carried, then no *Miranda* issue is presented.

With respect to non-*Miranda* voluntariness issues, we draw a distinction between the burden

We find, nevertheless, that even if the burden was on the government to demonstrate that the March 3 statements were voluntarily given, the government has met that burden under the unusual circumstances of this case. Here, the district attorney requested Investigator Salinas to obtain the statements of defendants Charles and McAninch. Salinas then returned to the district attorney the documents purporting to be the statements he was asked to take from Charles and McAninch. The district attorney could authenticate the signature of Salinas on the statements. Under these circumstances, we find the express written waiver of the right to remain silent and of the right to counsel "strong proof" of the validity of that waiver. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60

L.Ed.2d 286 (1979); *Ware v. Reed*, 709 F.2d 345, 350 n. 9 (5th Cir.1983); *Blasingame v. Estelle*, 604 F.2d 893, 896 (5th Cir.1979).[12] We also observe that on March 16 both of the defendants were given an opportunity by F.B.I. Agent Stepp to evaluate the statements allegedly given by them on March 3. Defendant Charles stated that the March 3 statement was true and correct and that he had no additions or changes, and defendant McAninch said that the statement was basically correct but he specified four additions or clarifications he wished to make. Since the March 3 statements themselves contained declarations that defendants knowingly and voluntarily waived their *Miranda* rights, we view their affirmation of the truthfulness of those statements on March 16 as also an affirmation of the knowing voluntariness of their waiver.[13]

---

of going forward with evidence and the burden of persuasion. We believe the law is clear that, once evidence is introduced that would support a determination that a confession was not voluntary, the government not only has the burden of producing evidence that the confession was voluntary, but also has the burden of persuasion on that issue by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (defendant raised issue by testifying the confession was beaten out of him). As we said in *Patterson v. United States*, 183 F.2d 687 (5th Cir.1950), *cert. denied*, 343 U.S. 951, 72 S.Ct. 1043, 96 L.Ed. 1352 (1952):

"... *where*, as in this case, *there is a conflict in the evidence* as to whether the confessions are or are not voluntary the burden of proof is upon the prosecution to prove to the court that the confessions were voluntarily made before they become admissible in evidence. " ....

"*Where*, as here, *the issue was raised* as to whether the confessions were or were not voluntary the Court should have instructed the jury that the burden of proof was upon the government to prove that the confessions were voluntarily made." *Id.* at 689–90 (emphasis added).

However, as to the initial burden of going forward with evidence, the rule is otherwise. As we stated in *Rhodes v. United States*, 224 F.2d 348, 352 (5th Cir.1955):

"... in the Federal courts there is no presumption against the voluntary character of a confession, and the burden is not on the Government in the first instance to show its voluntary character. *Hartzell v. United States*, 8 Cir., 72 F.2d 569, 577; *Ah Fook Chang v. United States*, 9 Cir., 91 F.2d 805."

*See also* 3 Wigmore, Evidence § 860 (Chadbourn rev. 1970) (generally endorsing this as the more practical rule, but recognizing a divergence of authority, with most states placing the initial burden on the prosecution). Under *Miranda*, however, if the interrogation is shown to be custodial, the government has the initial burden of going forward with evidence of compliance with *Miranda*. We do not believe, however, that a showing *merely* that the interrogation was custodial generally operates to shift to the government a burden of going forward with evidence *beyond* that necessary to support a finding of *Miranda* compliance. There may, of course, be exceptions, as possibly where it appears that for some reason evidence of what has occurred is unavailable to the defendant.

12. Of course, other evidence may destroy the efficacy of a waiver; for example, where it is shown that on being advised of his rights the defendant requests an attorney and expresses a desire not to speak, but the police continue to interrogate him and he is not furnished counsel. *See United States v. Massey*, 550 F.2d 300 (5th Cir.1977). But here there is *no* such evidence to cast doubt on the advice and waiver.

13. For the reasons stated in the text, *infra*, we reject the contention that the March 16 statements were made while defendants were in custody and were hence inadmissible because of failure to give *Miranda* warnings on that occasion.

We also reject the notion that we cannot use the March 16 affirmation that *Miranda* rights were warned of and waived on March 3 as a basis to uphold the March 3 statements because if the March 3 statements were inadmissibly

We also think it significant that defendants were police officers at the time both the March 3 and March 16 statements were made. The district court erroneously determined that it could not consider this fact in evaluating the voluntariness of the statements. The Supreme Court has unambiguously stated, however, that the waiver of constitutional rights must be considered in light of the background, experience, and conduct of the accused. *North Carolina v. Butler, supra,* 441 U.S. at 374–75, 99 S.Ct. at 1758 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). *See also Crooker v. California,* 357 U.S. 433, 440, 78 S.Ct. 1287, 1292, 2 L.Ed.2d 1448 (1958). That defendants were police officers at the

obtained this would also render the March 16 statements inadmissible. We note, to begin with, that we determine this question in the context of a record containing *no* evidence of any inadmissibility in the obtaining of the March 3 statements (and *no* evidence that they were custodial).

Recognition that a prior inadmissibly obtained statement can taint a later statement that is itself preceded by any warnings required and is not otherwise inadmissibly obtained, has generally been based on two theories.

First, the proximity in time of the two statements and the fact that they are made in the same unbroken custodial setting has led to the conclusion that the improper forces producing the first statement have carried over to the second or that the two statements should in effect be regarded as one. *Westover v. United States,* 384 U.S. 436, 494–97, 86 S.Ct. 1602, 1638–39, 16 L.Ed.2d 694 (1966) (second interrogation "conducted immediately following" the first "interrogation in the same police station—in the same compelling surroundings"); *Harney v. United States,* 407 F.2d 586 (5th Cir.1969) (second interrogation commenced within five hours of the end of the first and both took place in the same police headquarters building); *United States v. Nash,* 563 F.2d 1166, 1169 (5th Cir.1977) ("The two confessions were so closely related both in time and in circumstances that they were one and the same."). *But see New York v. Quarles,* — U.S. —, — n. 1, 104 S.Ct. 2626, 2634 n. 1, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring in part and dissenting in part). However, "[a] different case" is presented "if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights ...." *Westover,* 384 U.S. at 496, 86 S.Ct. at 1639. Here the second interrogation was conducted by a different authority, at a different location and thirteen days after the first, and in the interval it is apparent that defendants were not in custody. Although there was no warning for the second interrogation, none was necessary as it was not custodial.

The other taint theory is based on the notion that by confessing the accused has "let the cat out of the bag" and thereafter "can never get the cat back in the bag. The secret is out for good." *United States v. Bayer,* 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947). This puts the accused under considerable "psychological and practical disadvantages." *Id.* The person who has confessed to what only the perpetrator would know is indeed hard put to later deny his involvement. But even "the cat out of the bag" theory does not apply where there is considerable intervening time and the circumstances rendering the first statement inadmissible have been removed by the time of the second. *Id.* at 540–41, 67 S.Ct. at 1398. That appears to be the situation here. Further, the "cat out of the bag" theory seems to us to have at the most a substantially attenuated relevance to statements concerning the conditions under which a prior admission was made, as distinguished from statements concerning the same substantive subject matter as that of the prior admission. The "psychological and practical" considerations would seem to point just as strongly to subsequent denial that the prior statement was preceded by warnings or was otherwise voluntary as it would to affirmation that rights were warned of and waived when the previous admission was made.

Accordingly, there being no evidence that the March 3 statements were inadmissibly obtained or were even custodial, we conclude that if there is any presumed inadmissibility in such statements it does not, either under the *Westover* theory or "the cat out of the bag" theory, taint the portion of the March 16 statements which affirms that the March 3 statements were preceded by proper warnings and waivers. *See United States v. Monti,* 557 F.2d 899, 903 (1st Cir.1977).

We are not dealing with a situation involving any assertion or suggestion of affirmatively illegal or unconstitutional police conduct, such as an arrest violative of the Fourth Amendment or policy brutality. *See, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 106–10, 100 S.Ct. 2556, 2562–64, 65 L.Ed.2d 633 (1980); *Rochin v. California,* 342 U.S. 165, 342 U.S. 165, 96 L.Ed. 183 (1952); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). By contrast, the mere failure to give *Miranda* warnings in a custodial interrogation or the use of trickery or the like to obtain a statement is not, *of itself,* illegal or unconstitutional. *See, e.g., New York v. Quarles,* — U.S. —, —, 104 S.Ct. 2626, 2646, 81 L.Ed.2d 550 (1984) (Marshall, J., dissenting). Consequently, the considerations relevant to a "taint" determination are not necessarily entirely the same in the latter situation as in the former.

time their statements were given is therefore relevant to a determination of the voluntariness of their statements. *See United States v. Bienvenue,* 632 F.2d 910, 913 (1st Cir.1980) (noting that defendant was a police officer). *Cf. Government of Canal Zone v. Gomez,* 566 F.2d 1289, 1292 & n. 8 (5th Cir.1978) (taking into account that defendant had been arrested for the first time and therefore would not know his rights).

▬▬▬▬ Given all these circumstances, we find that the defendants were not free simply to sit back and present no evidence to rebut the showing made by the government. The defendants could have rebutted that showing by their own testimony at the suppression hearing, and they could have done so without material prejudice to their rights, as their testimony at the suppression hearing could not have been used against them (other than for impeachment) at trial. *See Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968); *McGahee v. Massey,* 667 F.2d 1357, 1364 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982). In general, the failure to produce a favorable witness or other evidence when it is peculiarly within a party's power to do so creates an inference that the witness' testimony will be unfavorable. *See United States v. Johnson,* 288 F.2d 40, 45 & n. 4 (5th Cir.1961). *See also United States v. Lehmann,* 613 F.2d 130, 135 (5th Cir.1980). Some application of this rule is appropriate here. In view of Salinas' death and the absence of any evidence of custodial status, failure to warn, or other impropriety, and since the defendants could have testified without material prejudice to their rights at trial, their failure to present evidence contradicting that presented by the government warrants at least some inference that the March 3 statements were, as they purported to be, properly obtained. *See Unit-*

ed States v. Helms, 703 F.2d 759, 765 (4th Cir.1983).[14]

The district court erred in its holding respecting the March 3 statements. There was evidence they were properly obtained, and no evidence to the contrary.

With respect to the oral statements made by defendants to F.B.I. Agent Stepp on March 16, the district court, concluding that the March 3 statements had not been proved to have been voluntary, determined that the March 16 statements were the product of prior statements presumed to have been improperly obtained, and were therefore inadmissible. As we have held that the district court erred concerning the March 3 statements, we must also reject this determination as to the March 16 statements.

▬▬▬ Defendants argue, however, that the failure of Agent Stepp to give the defendants *Miranda* warnings at the March 16 interviews made the March 16 statements inadmissible since the defendants were in custody at the time. As in the case of the March 3 statements, we find the mere fact that the interviews took place in the office of the chief of police and that the defendants were suspected of having committed a civil rights violation insufficient to demonstrate that the defendants were "in custody" at the time the statements were given. The only additional factor suggested by the defendants is that the chief had contacted them prior to the March 16 interviews and "notified" them to be present at his office at a certain time on the 16th. We cannot conclude from this fact, however, that the defendants were subject to a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. *Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. at 714. This is particularly so in light of Stepp's testimony and the fact that defendants were serving as police officers at the time.

---

**14.** We note that the facts of this case differ from those envisaged by *Miranda,* where the Court stated that the government had the only means of "making available corroborated evidence of warnings given during incommunicado interrogation." 384 U.S. at 475, 86 S.Ct. at 1628. Here the defendants possess the only possible evidence, if any exists, to challenge the government's *prima facie* showing of voluntariness.

## CONCLUSION

In conclusion, we hold that the defendants were not in custody at the time their March 3 statements were given and therefore were not entitled to *Miranda* warnings, but that even if it is presumed they were in custody, the government met its burden of proving the voluntariness of their statements. Furthermore, we find that the defendants were not in custody at the time their March 16 statements were given, that they were not entitled to *Miranda* warnings, and, therefore, that the March 16 statements should not have been suppressed. Accordingly, we hold that the district court erred in granting the motion to suppress as to each of the March 3 statements and as to each of the March 16 statements. The district court's order in this respect is accordingly reversed.

REVERSED.