UNITED STATES of America

v.

Aron GOLDBERGER.

Cr. No. 92–378 (JHG).

United States District Court,
District of Columbia.

Oct. 27, 1993.

Theodore A. Shmanda, Asst. U.S. Atty.,
Washington, DC, for government.

Stephen L. Braga and Miller Cassidy, Lar-
roca & Lewin, Washington, DC, for defen-
dant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

On October 6, 1992, a grand jury returned
an indictment charging that defendant Aron
Goldberger ("Goldberger") willfully and
knowingly made a false statement in an ap-
plication for a passport in violation of 18
U.S.C. § 1542. Subsequently, defendant
filed a Motion to Dismiss the Indictment or,

in the Alternative, to Suppress Evidence, which was opposed by the government, and a *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), evidentiary hearing was held. For the reasons stated below, Goldberger's motion to suppress is granted, however, the government will be afforded the opportunity to demonstrate an independent basis for its prosecution, failing which, the single count indictment will be dismissed.

## BACKGROUND

### I. *Prior Proceedings*

In 1989, in the Circuit Court for Baltimore City, Goldberger's wife, Esther Goldberger, sought a divorce, child custody and child support from her husband. In the bitter dispute, which included allegations of child abduction, child abuse, and mental illness, Goldberger contested both the divorce and custody of the couple's six children. In light of the abduction allegations, Goldberger surrendered his United States passport in January 1991 to insure that he could not take his children to Israel during the pendency of the proceedings. The relinquishment of his passport was memorialized in an Order dated February 27, 1971 by Circuit Judge Hubbard, stating that "pending further Order of this Court, the Defendant will allow his passport(s) to remain in the custody and possession of his counsel...." At the time a pretrial conference was held in March 1992, no future Order had been issued modifying the February 1991 Order.

On March 4, 1992, in the midst of the state court proceedings, the case was placed on the docket for Judge Edward J. Angeletti ("the Judge") who held a pretrial conference. The matter commenced with an untranscribed conference in chambers between the Judge and the attorneys. At its conclusion, the attorneys [1] and the Judge entered the courtroom, where the Goldbergers were already present. Once seated, the Judge made some preliminary remarks regarding the upcoming trial, support payments, and a medical examination. In the course of these remarks, the

Judge warned Goldberger that if he failed to pay the child support that he currently owed or was, in the future, late with payments, he would be incarcerated for contempt of court. Then, the Court forbade Goldberger from leaving the jurisdiction without prior approval, heard and denied Goldberger's motion for marriage counseling, and began to address Goldberger's motion to travel to Israel for his brother's wedding. The Judge commented that he had "been advised that since [Goldberger] was ordered not to leave the country and to turn in his American passport, he used his Israeli passport to leave the country...." Transcript of *Esther Goldberger v. Aron Goldberger,* case no. 89333019/CE 105927 (Baltimore, Md. March 4, 1992) ("Maryland Transcript"), at 8. When asked for her position on Goldberger's motion to travel to Israel, Esther Goldberger's counsel, stated:

> in light of the fact that Mr. Goldberger, when he's desperate, has taken the children before, just as a point, you had stated that he turn over his Israeli passport. I think to be more specific, the Court should make sure that Mr. Goldberger understands in case he has another American passport, or whatever he's using to exit the country, I'm not an expert on immigration, but I don't know what he used to go out of the country last time.

*Id.* at 11. The Judge replied that Goldberger

> has an Israeli passport, and you haven't heard a single protestation from him to the contrary and to what everything that I've said. And if he has any other passports, then he's in violation of American law, and he will be appropriately prosecuted for it.

*Id.* The Judge thereupon stated: "I'll put the question point blank to him. Stand up, please, Mr. Goldberger. Raise your right hand and be sworn, sir." *Id.* at 12. The Judge proceeded to question Goldberger regarding his passport situation. Under oath, Goldberger admitted that he did not have an Israeli passport, instead he had earlier left

---

1. Goldberger was represented by counsel in the Maryland proceedings different than in this criminal case.

the country with an American passport—a duplicate of the one he had surrendered to his attorney in February 1991. That information was ascertained through the following colloquy between the Court and Goldberger:

Q. After you gave the passport to your counsel you testified under oath that you lied on a passport application that you lost the passport?

A. No, your Honor. It was lost to me.

Q. Mr. Goldberger, I'm not going to play semantical games with you sir. Answer my questions. You're an intelligent man. You're also very duplicitous and very devious, as I'm finding out. And my initial impression of you is absolutely correct. Now, did you in fact lie on your application to get a duplicate passport?

A. I didn't consider it lying.

Q. Did you tell something on the passport application under penalty of perjury that you lost the passport, when in fact, you did not?

A. It was lost to me.

Q. Mr. Goldberger, don't play semantical games with me, sir. Did you, in fact, misrepresent the truth on your duplicate passport application, sir?

A. I wrote that I lost it.

Q. Are you going to answer my question or not, sir? Are you going to finally start acting like a man, instead of like a baby and like a child? I'm waiting, sir.

A. I guess what your Honor is saying is correct.

Q. So did you lie on the application for a duplicate passport?

A. I didn't think I was lying.

Q. Did you lie?

A. Not in my mind. Not from—

Q. Do you take your religion seriously, sir?

A. Yes, sir. I do.

Q. Does your religion permit you to stand up and lie under oath?

A. No.

Q. Then tell the truth, sir.

A. That was the truth, your Honor.

Q. What is the truth?

A. That I wrote that I lost it.

Q. And did you, in fact, lose your passport?

A. Well, it was lost to me.

Q. Was it lost, sir, in the strict sense of the word, as the application contemplates the word lost?

A. Yes, sir.

Q. Was it?

A. Yes, sir.

Q. It was? Where was it lost, sir?

A. No, I said—I thought I heard a different question.

Q. Was the passport lost in the sense of the word on the application?

A. No.

Q. Then did you misrepresent the truth?

A. Yes, sir.

*Id.* at 13–15. Thereafter, the Judge demanded the children's passports and all others, originals and duplicates, from Mr. Goldberger's counsel and sensing that counsel was insufficiently responsive and quibbling, advised counsel that

... I have a whole lot more authority over you than I do over [Goldberger].... Now, as an officer of the Court, don't put the Court in a position of having to come down on you. Now you better be totally honest with me, Sir.... Don't assume the mantle of your client, Sir. Your integrity is too important to you.... Then tell it like it is, Sir. As an officer of the Court, you owe me the truth. And don't try to deceive me again because I absolutely will not tolerate it.

*Id.* at 17–19.

This information was later referred to the United States Attorney's Office for prosecution. According to the affidavit submitted in support of an arrest warrant for Goldberger by Special Agent Malone of the U.S. Department of State, Bureau of Diplomatic Security, on April 10, 1992, at the conclusion of the Goldberger trial, the Judge contacted the Special Agent to advise him that Goldberger had fraudulently obtained a United States passport. The affidavit further states that the Judge also contacted the Baltimore U.S. Attorney's Office "to report Goldberger's

false statements to obtain a duplicate passport." After interviewing Passport Examiner Kevin Hall who, during the passport application process, had checked Goldberger's photograph and administered the oath when Goldberger applied for a new passport, Special Agent Malone signed and swore to the affidavit before a Magistrate Judge in support of an arrest warrant. The warrant issued and Goldberger was subsequently indicted in the District of Columbia for making a false statement in an application for a passport in violation of 18 U.S.C. § 1542.

## II. *This Hearing*

The following summarizes Goldberger's testimony at the motion to dismiss indictment/suppression hearing, at which Goldberger was the sole witness to testify: Goldberger, a thirty-two year old American citizen, after graduating from high school, has been a rabbinical student studying for approximately thirteen years in a rabbinical college in Jerusalem, Israel or in New Jersey. He currently resides in New Jersey. Due to his studies, he has never been employed in any position. Moreover, Goldberger contends that he has never watched television, never gone to a movie, never read detective or police stories, never testified under oath as a witness, never been informed of his right to decline to answer questions which might incriminate him, and is completely unfamiliar with the American court system. There is no evidence to the contrary.

According to Goldberger, his typical day as a rabbinical student begins before dawn with preparation for the morning prayers. Then, there is a morning session from 9:00 a.m. to 1:00 p.m., during which the students study the Talmud. Next, come the afternoon prayers and the afternoon Talmud session which ends at approximately 7:00 p.m. After that, there is an ethics lesson and then evening prayers. After evening prayers, the night session begins and only ends when everyone goes to sleep, generally at 1:00 or 2:00 a.m.

Mr. Goldberger saw Judge Angeletti for the first time on March 4, 1992 at the pretrial conference in his divorce/custody proceedings. It was also the first time that he had ever been required to testify in the case by any judge. Goldberger believed that the hearing was scheduled solely to discuss pending motions regarding his children and that neither his presence, nor his wife's, was necessary. According to him, the only reason he did attend was to see his wife.

The courtroom hearing commenced immediately as the Judge and counsel returned from their conference session, allowing no opportunity for Goldberger to consult with his attorney. As his attorney reentered the courtroom, the attorney mumbled to Goldberger that there was going to be a "full-fledged hearing," but said nothing else. Goldberger described his lawyer as "upset" and red in the face and shaking, which he concluded was the result of the chambers conference. Everyone was seated at one long counsel table facing the Judge. That table was located approximately fifteen to eighteen feet away from the Judge, and Aron and Esther Goldberger were each seated next to their respective counsel. Also present was the court-appointed attorney who represented the six children.

After the Judge made some preliminary remarks and orders, he suddenly placed Goldberger under oath and began questioning him concerning the passport incident. Goldberger testified that the questioning began so abruptly that he had no opportunity to consult with his lawyer prior to answering the Judge's questions. During the hearing, he repeatedly looked at his counsel for direction; however, the attorney ignored him and never interceded on his behalf. When Goldberger asked his attorney after the hearing why he had not said anything, the attorney responded that if he had, they would both be sitting in prison.

The Judge's remarks subsequently leveled at counsel portray the temper of the hearing. Having just stated that if Goldberger had any other passports he would be in violation of law and "appropriately prosecuted for it," Maryland Transcript, at 12, the Judge proceeded to that result. To fully appreciate the hostile environment of the inquiry, the entire transcript (as presented to this Court) must be read: The bombardment of questions, the precision of the mark, the accelerating delivery interspersed with a taunt

about Goldberger's manhood, a pronouncement about his duplicity, and a question about how seriously this rabbinical student takes his religion.

As Goldberger describes, the Judge looked "very scary" and because it was Ash Wednesday, he had a "big ash mark on his forehead." Moreover, the Judge is apparently a large man, about 6′ 6″ tall, whose manner of questioning frightened Goldberger. Goldberger testified further that the Judge screamed at him, which "forced" him to say things which he did not wish to say. According to Goldberger, the Judge's regular tone of voice had a "very high tone" and a "frightening manner of speech," as distinct from his "screaming-screaming" tone.

Goldberger declared that he believed that a judge is like God and he had no idea that he could tell the Judge that he could not answer his questions, and did not know that he had a right to not answer questions that might incriminate him. Thus, according to his testimony, he did not freely and voluntarily testify and had no idea that he could ask to consult with counsel or not answer. In fact, he had been taught in Jewish law to fear, honor, and respect a Judge. However, he was also taught to answer honestly questions asked by a judge. When asked by this Court whether he had ever testified in a deposition before March 1992, Goldberger replied in the negative.[2] Nevertheless, his present attorney (as an officer of the court), advised this Court that Goldberger had so testified in a deposition in his attorney's office. Once reminded of this event, Goldberger recalled the deposition and estimated that it occurred between August and October 1991.

On cross-examination, Goldberger admitted that he had voluntarily relinquished his United States passport, which surrender was then memorialized by an order directing that the passport be given to Goldberger's attorney. He also conceded that since Judge Angeletti knew he had traveled to Israel after he had given his passport to his attor-

ney, the Judge could have had legitimate questions about how he was able to travel abroad. When questioned at the hearing about the statements he made on his passport application, Goldberger asserted that when he filled out the application, he had truly believed that the passport was lost.

## DISCUSSION

In light of the circumstances surrounding his confession to making a false statement on his passport application, Goldberger contends that his indictment should be dismissed, or, at the very least, his statement should be suppressed. He argues that dismissal is merited on two grounds. First, he states that *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), applies to his case, and the failure to give *Miranda* warnings is fatal to the government's use of his statements. Second, he argues that the confession was coerced and involuntary. Although both arguments are facially appealing, only the second requires suppression.

■ The Fifth Amendment to the United States Constitution states, *inter alia*, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In certain situations, the Supreme Court has held that the Constitution requires that warnings be given prior to questioning. *Miranda v. Arizona*, 384 U.S. at 477–78, 86 S.Ct. at 1630. Nonetheless, before the requirements of *Miranda*, and its progeny, are triggered, both custody and interrogation must simultaneously occur. *Id.*; *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation."). In this case, the government concedes what the record clearly evidences: that the Judge was "interrogating" Goldberger—"He knew that [the questions] were reasonably likely to elicit an incriminating response." Government's Op-

---

**2.** Page 17 of the Maryland Transcript: "During Mr. Goldberger's deposition they were pro-

duced."

position to Defendant's Motion to Dismiss Indictment or Suppress Evidence, at 3.[3] Yet, the government maintains that Goldberger was not in custody for purposes of *Miranda*.[4]

■ Custody involves the "[deprivation] of . . . freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Or in other words, the inquiry "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (per curiam)). Whether custody exists is determined by the measure of a reasonable person in the suspect's shoes, not upon the interrogator's subjective intent. *Berkemer v. McCarty*, 468 U.S. 420, 440–42, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

■ In this case, Goldberger was not in custody and hence *Miranda* does not govern. The questioning occurred during a civil court proceeding, attended voluntarily by Goldberger.[5] A reasonable person in Goldberger's shoes would not believe that he or she was in custody during the hearing. In fact, other more potentially coercive situations have not been deemed custodial. For example, in *Berkemer v. McCarty*, the Supreme Court held that an individual stopped by a police officer and asked about his sobriety was not in custody. 468 U.S. at 440, 104 S.Ct. at 3151. In the same vein, even where an individual was the focus of a criminal tax investigation, it was held that custody did not exist. *See Beckwith v. United States*, 425 U.S. 341, 344–48, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). Even though *Miranda* warnings were not required in the instant case, the Court must still determine whether Goldberger's "confession was made voluntarily" under the Fifth Amendment. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Court must hold a voluntariness hearing once a defendant challenges the voluntariness of his or her confession. *See* 18 U.S.C. § 3501(a) (1988); *Jackson v. Denno*, 378 U.S. 368, 376–77, 84 S.Ct. 1774, 1780 (1964). At this hearing, the government must by a preponderance of the evidence demonstrate voluntariness. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972).

■ The voluntariness of a confession turns on the totality of the circumstances.

---

**3.** In its oral argument before this Court, government counsel stated that although the previous government counsel may have conceded that the judge's statements were likely to elicit an incriminating response, "the government does not any longer concede that, if in fact it is a concession." Transcript, *United States v. Aron Goldberger*, Cr. 92–0378 (December 2, 1992) ("Criminal Proceeding Transcript"). The government should not be allowed at final argument to withdraw its prior position when reliance has been placed on the concession clearly made in its written papers. Even were the concession considered withdrawn, the Court would still conclude that the interrogation was reasonably likely to elicit an incriminating response.

**4.** While the government bears the burden of demonstrating voluntariness of a confession, here the defendant has the burden of establishing custody. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir.1984).

**5.** Furthermore, several circuits addressing the related issue of whether statements made to a probation officer by a defendant in preparation of a presentence report may be used against him have held that because the probation officer is an arm of the Court, not the prosecution, the Fifth Amendment's *Miranda* protections do not apply. *See, e.g., United States v. Rosengard*, 949 F.2d 905, 908 (7th Cir.1991)., *cert. denied*, —— U.S. ——, ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); *United States v. Jackson*, 886 F.2d 838, 841 (7th Cir.1989). Similarly, a routine meeting between a defendant and her probation officer does not constitute custody. *Minnesota v. Murphy*, 465 U.S. 420, 431–33, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984).

The precepts of *Miranda* were expressly designed to address overreaching by *law enforcement officers*, not the court. In describing the requirement of custodial interrogation, the Supreme Court states:

we mean questioning initiated by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

384 U.S. at 442. (footnote omitted) (emphasis added). Accordingly, *Miranda* and other cases caution against expanding the reach of *Miranda* beyond the circumstances faced in that case.

*Arizona v. Fulminante,* 499 U.S. 279, ——, 111 S.Ct. 1246, 1252–53, 113 L.Ed.2d 302 (1991); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Hackley,* 636 F.2d 493, 499 (D.C.Cir.1980). As the Supreme Court queried:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of this confession offends due process.

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). To determine whether an individual has "willed to confess" or whether his will has indeed been "overborne" both the characteristics of that individual and the details of the interrogation must be scrutinized. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *United States v. Robinson,* 698 F.2d 448, 455 (D.C.Cir. 1983). Moreover, official coercion is a necessary element of this test. *Connelly,* 479 U.S. at 170, 107 S.Ct. at 523.

■ Here, the extraordinary characteristics of this defendant combined with the aggressive interrogation to which he was suddenly subjected by the Judge presiding over his domestic/child custody action mandate a finding of involuntariness. As noted, this defendant has lived differently from most: unsophisticated in worldly matters, he is totally enveloped in the shelter of religion which directs his time, his studies, his actions and his reactions. It is not at all difficult to conclude that he did not know he could ask to consult with counsel, that he did not know that he could at least attempt to invoke the Fifth Amendment and that he was not required to incriminate himself. Nothing he did was voluntary—he did not know his options or his rights, nor was he informed of them. He could not waive rights he did not

know existed. In his view, he had to respect and fear the Judge and behaved accordingly.[6]

In addition, the manner of questioning itself was also quite unusual. Although the evolution of the questioning was innocent and unobjectionable, the result was less so. For instance, the Judge knew from the record that Goldberger was no longer in possession of his American passport. He also knew that the purpose behind that relinquishment was to prevent Goldberger from taking his children out of the country during the pendency of the custody dispute. Thus, after learning that Goldberger had left the country to go to Israel despite having previously relinquished his passport, the Judge concluded that Goldberger possessed an Israeli passport. Once Esther Goldberger's attorney expressed concern that Goldberger would take the children and leave the country as he had done in the past, the Judge quite reasonably was motivated to inquire how Goldberger had been able to leave his country without his American passport. Since he knew Goldberger did not have an American passport, the Judge reached the not illogical conclusion that Goldberger either had an Israeli passport or had fraudulently obtained a second passport, or as Goldberger admitted he could have done, had used someone else's passport. Either of the two last actions carry criminal penalties and if Goldberger had an Israeli passport, in light of the custody dispute, that passport would likely be required to be surrendered to the Court until custody had been determined.

Still, despite its understandable premise of protection of the children, the questioning demonstrated the Judge's escalating sense of frustration—even from the written record, one can sense the mounting exasperation. On several occasions, the Judge castigated Goldberger, calling him duplicitous and devious; ordering him to act like a man, not like a baby. Moreover, regardless of the Judge's well-founded frustration with what he could reasonably view as the "semantical games" being played by Goldberger, his questioning

---

**6.** The "give and take" between Goldberger and the Judge as they discussed the meaning of the word "lost" does show that Goldberger was not entirely browbeaten by the Judge's questioning and some of Goldberger's answers were not entirely credible. However, when considered with Goldberger's unusually sheltered background and the novel scenario presented, the Court cannot conclude that the government has met its burden to prove voluntariness by a preponderance of the evidence.

was akin to that of a prosecutor vigorously cross-examining a defendant. There was no viable opportunity for Goldberger to confer with his counsel; he himself was not sufficiently schooled as to the right to ask the Judge for an opportunity to consult counsel. The Judge did not make that suggestion to Goldberger. Accordingly, the Judge's words and the uncontested testimony from Goldberger that the Judge's physical presence was so imposing and his manner of questioning (shouting and screaming), considered in combination with Goldberger's unworldly background focused on his rabbinical studies support a finding that the statements made by Goldberger were not voluntary and those statements must be suppressed.

■ Whether Goldberger's indictment may nonetheless survive is an entirely different question. That evidence obtained in violation of the Fifth Amendment must be suppressed under the fruit of the poisonous tree doctrine is well-settled. *Harrison v. United States*, 392 U.S. 219, 223–24, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968); *Bram v. United States*, 168 U.S. 532, 548, 18 S.Ct. 183, 189, 42 L.Ed. 568 (1897). However, exclusion of illegally obtained evidence is not mandated in all situations. For example, when the evidence is obtained through a source independent of the illegality, that evidence need not be suppressed. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Underlying that rule is the desire not to place the government in a worse position than it would have been had the illegal confession not occurred. *See Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988).

Although these cases do not speak directly to the instant case because there is no independent source for Goldberger's statements, the policy underlying that rule is helpful. Here, the government's prosecution of Goldberger appears wholly premised on the incriminating statements he made in his domestic case when placed under oath at the behest of the Judge. As a consequence, without those statements, it is unclear whether there is an independent basis for Goldberger's prosecution. Without the statements, the government knew that: Goldberger, under Court order, submitted his passport to his attorney and he traveled outside of the United States after turning in his passport. With further investigation, the government uncovered Goldberger's passport application and the statement upon it that he had "lost" his other passport. Whether this investigation would have been undertaken without Goldberger's confession is certainly not evident from the record.

Accordingly, it is hereby

ORDERED that the motion to suppress is granted; it is

FURTHER ORDERED that on or before November 16, 1993, the government must inform the Court and the defendant, through counsel, in writing, whether it will demonstrate an independent source for Aron Goldberger's prosecution. Defendant must respond to any submission by the government on or before December 2, 1993. The government's reply, if any, will be due by December 10, 1993.

IT IS SO ORDERED.